UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

    Plaintiff,

 vs.         REPORT AND RECOMMENDATION

Edward Joseph Lowen,

     Defendant.   Crim. No. 10-96 (RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Pretrial Motions of the Defendant:

  1. The Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure;

  2. The Defendant's Motion to Suppress Statements, Admissions, and Answers;

  3. The Defendant's Motion to Suppress Eyewitness Identifications.

A Hearing on the Motions was conducted on May 10, 2010, at which time, the Defendant appeared personally, and by Andrew H. Mohring, Assistant Federal

Defender, and the Government appeared by Kevin S. Ueland, Assistant United States Attorney.

For reasons which follow, we recommend that the Defendant's Motions to Suppress be denied.

## II. Factual and Procedural Background

The Defendant is charged with one (1) Count of bank robbery, in violation of Title 18 U.S.C. §2113(a). The events which gave rise to that charge are alleged to have taken place on or about February 26, 2010, in this State and District. As pertinent to the charge, and to the Motions now before us, the operative facts may be summarized as follows.[1]

At the Hearing, the Government adduced the testimony of Colter Diekmann ("Diekmann"), who is an Investigator with the Hubbard County Sheriff's Department.

---

[1]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require. See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991), cert. denied, 505 U.S. 1228 (1992); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

In addition, the Government offered, as Exhibits, and without objection from the Defendant, two (2) Search Warrants, which are dated March 3, and March 4, 2010, and a transcript of a tape recording that was taken during law enforcement's interview of the Defendant, at his residence, on March 3, 2010.

The first challenged Search Warrant (the "first Search Warrant"), which is dated March 3, 2010, was issued by the State District Court for Hubbard County, Minnesota, and authorized a search of a green colored residence, which is located at a specific address on Beckerline Road, in Park Rapids, Minnesota; a search of a blue, 2005 Chevrolet Tahoe with a Minnesota license plate of NDS 413; as well as a search of the Defendant's person. See, Government's Exhibit 1. In particular, the Search Warrant authorized a search for a dark colored duffel bag; a colored baseball hat; a camouflage jacket; a black semi-automatic handgun; white tennis shoes; sunglasses; gloves; cash, in various denominations; records tending to show possession or transfer of money since February 26, 2010; indicia of residency; bank and financial records; and a DNA sample, and fingerprints, from the Defendant. In addition, the Search Warrant authorized law enforcement to take photographs, and video footage, of the property, and of the Defendant's person.

Attached to the Search Warrant was an Application, and Affidavit, that were executed by Chad Museus ("Museus"), who is a Special Agent with the Minnesota Bureau of Criminal Apprehension ("BCA"), and who is assigned to the Bemidji Regional Office, where he assists local police and Sheriff's Departments investigate major crimes. Museus disclosed that he has been in law enforcement since 1998, and that he has seven (7) years of experience as an investigator.

In his Affidavit, Museus set forth the reasons which led him to believe that evidence of criminal activity would be found at the Defendant's residence, in his vehicle, and on his person. Specifically, Museus explained that he was assisting the Hubbard County Sheriff's Office in an investigation of a bank robbery that occurred on February 26, 2010, at a branch of the First National Bank of Walker, which is located in Akeley, Minnesota (the "Bank"). A male suspect, who appeared to be in his forties or fifties, reportedly walked into the Bank, "brandished a black colored semi automatic type handgun and demanded money from the on duty teller." Museus averred that the suspect handed the teller a dark colored duffel bag, in which to place the money, and that a total of $2,525.00 was taken during the course of that robbery.

According to Museus, the suspect was wearing a camouflage jacket, a dark colored baseball cap with writing on the front, blue jeans, gloves, sunglasses, and

white tennis shoes. Upon leaving the Bank, the suspect was observed driving a dark blue, four-door Chevrolet Tahoe, with a model year ranging from 2000 to 2006. Video surveillance revealed that the vehicle did not have a front license plate.

Museus attested that he reviewed the records for registered owners of blue Tahoes with a model year from 2000 to 2006, who lived in Beltrami, Cass, or Hubbard Counties. Those records revealed that the Defendant was the registered owner of a 2005 Tahoe, which fit the reported description of the suspect's vehicle, and that the vehicle bore Minnesota license plate NDS413. Those records further disclosed that the Defendant resided at a specific address, located on Beckerline Road, in Hubbard County (the "residence").

In his Affidavit, Museus attested that, on March 3, 2010, he and Diekmann knocked on the door of the Defendant's residence, in order to inquire as to his whereabouts on the day of the robbery. Nobody answered the door, and the Agents left the residence. However, as the Officers were leaving, they met the Defendant walking on Beckerline Road, at which time, he invited them to his residence. Museus averred that, while they were walking up the driveway with the Defendant, he observed a white tennis shoe approximately 200 feet from the Defendant's residence, lying in the woods alongside the Defendant's driveway. According to Museus, the

pattern on that shoe matched the pattern on the shoes that he observed the suspect wearing on the surveillance footage of the bank robbery. Upon further inspection, the other half of the pair of shoes was observed nearby.

In his Affidavit, Museus noted that the Tahoe in question was parked at the Defendant's residence, and that it matched the description of the vehicle that was driven by the suspect, as observed on the video surveillance footage. According to Museus, the vehicle had a front license plate on, but the Agents observed recent pry marks on the license plate screws. According to Museus, the vehicle was dirty, which was also consistent with witness descriptions of the vehicle driven by the robbery suspect. The Defendant consented to a search of the vehicle, during which Officers found a pair of sunglasses and a pair of gloves. Museus reported that the Defendant's physical description also matched the suspect's description.

Museus further related that, while at the residence, following a valid waiver of his Miranda rights, see, Miranda v. Arizona, 384 U.S. 436 (1966), the Defendant gave a statement, during which he denied owning any tennis shoes, or any handguns. According to Museus, the Defendant initially consented to a search of his residence, although he ultimately withdrew his consent before a full search could be completed. During the consented search, law enforcement discovered a money order receipt dated

March 1, 2010, which disclosed that the Defendant had obtained a money order in the amount of $1,100.00, at a Wal-Mart Store that is located in Bemidji, Minnesota. Museus attested that, when questioned about that receipt, the Defendant stated that he had used money that he had been saving up, and that he had sent the money to his son for a car payment. Museus further advised that the Defendant had represented that he was a part-time truck driver. The Affidavit reported that the Agents remained at the Defendant's residence while awaiting a Search Warrant.

The Return for the Search Warrant reveals that the Warrant was executed on March 3, 2010, at 6:10 p.m., and that the following property was seized: one pair of white tennis shoes; paperwork and documents found on the Defendant's kitchen shelf; paperwork that was found on top of a microwave; an accordion folder containing bank information; a black folder containing paperwork; a black bag; receipts; a Winners Club Leech Lake Gaming Card; cash in $1.00 bills; a buccal swab kit taken from the Defendant; a pair of sunglasses; bills; a baseball cap; a photograph showing the Defendant in camouflage; a pair of work gloves; a pistol operation manual; and various pieces of burnt or melted materials.

The second challenged Search Warrant (the "second Search Warrant"), which was dated March 4, 2010, was also issued by the State District Court for Hubbard

County, Minnesota, and authorized the seizure of a cell phone, and charger, which were located in the kitchen of the Defendant's residence, and the download of all stored date on that cellular phone.  See, Government's Exhibit 2.

Attached to that Search Warrant, were an Application, and Supporting Affidavit, which were executed by Museus.  In his Affidavit, Museus averred that, on March 3, 2010, he had prepared a Search Warrant for the Defendant's residence, in relation to the investigation of the bank robbery that occurred on February 26, 2010.  According to Museus, during the execution of that Search Warrant, he observed a cell phone in the kitchen area of the Defendant's residence, that the Defendant had told him his cell phone number, and that the Defendant told him that the cell phone in the kitchen was for that phone number.  Museus attested to his belief that cell phone data would assist law enforcement in establishing a timeline of the events of the bank robbery, and of the locations that the Defendant visited around the time of the robbery.  Museus further averred that this could lead to the identification of additional witnesses in the case.  The Return for the second Search Warrant indicated that it was executed on March 4, 2010, at which time, the cell phone, and its charger, were seized.

As noted, the Government elicited the testimony of Diekmann, who was personally involved in the investigation of the Defendant.  Diekmann testified that he

has been employed by the Sheriff's Department since May 17, 2004, and that he has worked as an Investigator since June of 2009. In that position, Diekmann investigates all major felonies, with the present case being the first bank robbery investigation in which he has been involved.

As related by Diekmann, on February 26, 2010, he was dispatched to the scene of the bank robbery, which occurred at approximately 5:25 o'clock p.m. Upon arriving at the Bank, Diekmann spoke with the Chief Deputy, who briefed Diekmann on what had transpired, and what was transpiring at that point. Law enforcement was securing the inside of the Bank, and Diekmann assisted with collecting evidence outside of the Bank. In addition, Diekmann interviewed witnesses, and collected video surveillance footage. During his interviews of the witnesses, Diekmann learned that the bank robber exited the Bank on foot, got into a Blue Tahoe that was facing westbound, and that the suspect drove off, and turned onto a northbound road.

Diekmann averred that, based upon the witnesses' descriptions, law enforcement believed that the Tahoe in question was somewhere between a 2000, and a 2006 model. On March 1, 2010, based upon this information, law enforcement obtained a list of registered owners of Tahoes that were either blue, or of an unknown

color, and that fit the possible model of the vehicle, and who lived in either Hubbard, Cass, or Beltrami Counties.

Diekmann further attested that, following law enforcement's review of the video surveillance, they published a photographic still of the suspect, which was taken from the video surveillance, for identification purposes. Law enforcement received five (5) tips, in response to the published photograph and, on March 2, 2010, a person identified the Defendant as the person in that photograph. Law enforcement further discovered that the Defendant was on the list that it had obtained of registered owners of blue Tahoes.

Diekmann testified that, based upon that information, the Defendant moved to the top of their list of suspects. Accordingly, on March 3, 2010, Diekmann, Museus, BCA Agent William Bennett ("Bennett"), BCA Agent Janet Nelson ("Nelson"), and Hubbard County Deputy Brian Halbasch ("Halbasch"), went to the Defendant's residence, which was located on Beckerline Road, in Park Rapids, Minnesota.

Deikmann testified that, upon arriving at the entrance to the Defendant's property, they observed that the driveway was unplowed. According to Deikmann, he and Museus walked up to the residence and knocked on the door for several minutes, but there was no answer. They left their business cards at the door, walked

to the end of driveway, and drove to the end of Beckerline Road, where they pulled onto a public access road, in order to discuss their next steps in the investigation. Deikmann stated that Halbasch was still parked on Beckerline Road at that time, and that he observed a man, who was later identified as the Defendant, walking out of the woods near his residence, onto southbound side of Beckerline Road, at which time, Deikmann and Museus drove down to meet the Defendant. During the initial encounter, Museus remained in the vehicle while Diekmann exited the vehicle, and initiated face to face contact with the Defendant.

Diekmann testified that he was dressed in plainclothes, with a protective vest and his Sheriff's jacket over them, and he acknowledged that his firearm was visible. Museus was also dressed in casual clothing, although he was wearing a kevlar vest with the word "police" printed on it. Diekmann stood a few feet away from the Defendant and introduced himself, and informed the Defendant that they were investigating a bank robbery that had occurred in Akeley, Minnesota, and that his name had come up on a list of registered owners of blue Tahoes in the area, that they were talking to everyone on that list so as to eliminate people as suspects, and that they were there to talk to him about the bank robbery. Diekmann asked if the officers could accompany the Defendant back to his residence for questioning, and the

Defendant agreed, and escorted Museus and Diekmann up the driveway to his home. Diekmann testified that, during that initial interaction, the Defendant appeared very calm, and did not appear to be under the influence of drugs or alcohol.

Upon entering the residence, the Defendant, Museus, and Diekmann, sat at a table in the dining room, where the Officers questioned the Defendant about his whereabouts on the day of the bank robbery. Museus and Diekmann again explained that they were investigating the bank robbery, that the Defendant's vehicle matched the description of the suspect's vehicle, and that the Defendant's physical characteristics matched the suspect's physical description. When asked about his whereabouts on the date of the robbery, the Defendant claimed to have been at home. The Agents further asked the Defendant about his employment, and the Defendant disclosed that he worked part-time for a trucking company. The Defendant also told the Agents that he owned a rifle, and a .22, but that he did not hunt or own any camouflage clothing. After a short while, Diekmann asked the Defendant if they could take a look at his vehicle for elimination purposes, and the Defendant agreed. According to Diekmann, nobody threatened the Defendant or made any promises or other inducements, in order to obtain the Defendant's consent, and that the Defendant's demeanor remained calm during their interaction.

Nelson, who is a photographic expert with the BCA, came up to the residence in order to assist with the search of the Defendant's vehicle, during which the Officers found a pair of aviator sunglasses, a pair of work gloves, a dark colored hat, and a receipt that was issued on the day of the robbery. In addition, the Officers observed that the  screws on the front license plate appeared to have fresh pry marks on them. Diekmann testified that the aviator sunglasses, and the work gloves, were consistent with those worn by the suspect during the robbery. During an interaction with Nelson away from the Defendant, Diekmann stated that "I was thinkin [sic] we got em work [sic] worked over as far as the [sic] we want to eliminate you bit." See, Government's Exhibit 3, at p. 10 of 16.

As related by Diekmann, while the Agents were outside, Museus directed their attention to a white shoe, which was lying on the west side of the driveway about halfway between the Defendant's residence, and Beckerline Road. Diekmann testified that the shoe was about eighteen (18) feet from the driveway, and it was lying so that he could see the side of the shoe very well. Diekmann reported that the shoe had a distinctive design, which was consistent with the shoes that were worn by the suspect during the robbery.

According to Diekmann, soon thereafter the Agents went back into the Defendant's residence, and they asked the Defendant if they could also search the Defendant's residence.  The Defendant agreed, and Bennett conducted a search of the Defendant's home.  While Bennett was conducting a search, Diekmann and Museus resumed their questioning of the Defendant.  Diekmann averred that the Defendant could see what Bennett was doing, and he did not object, or ask the Agents to stop searching the residence.   Around this time, Museus advised the Defendant of his <u>Miranda</u> rights, and the Defendant indicated that he understood those rights, and that he was willing to continue talking with the Agents.  In particular, their exchange was as follows:

> CM- [I] wanted to sit down and talk to you for a few moments ah um then we'll be on our way ok[2]
>
> EL- ok
>
> CM- um I am gonna read you your miranda rights just because that's what we do when we talk to people um and we just don't wanta make sure that we we [sic] want to make sure that we take care of you you know and
>
> EL- ok

---

[2]In the transcript of the interview, the initials "CM" refer to Museus, and the initials "EL" refer to the Defendant.

CM- to respect your rights ah you have the right to remain silent do you understand that

EL- yup

CM- anything you say can and will be used against you in a court of law do you understand that

EL- yup

CM- you have the right to talk to a lawyer now and have the lawyer present now or at anytime during questioning do you understand that

EL- yup

CM- if you cannot afford a lawyer one will be appointed for you without cost do you understand that

EL- yup

CM- do you understand each of these rights as I've explained them to you

EL- yup

CM- ok can we talk for a few more minutes about the akeley bank robbery

EL- yeah sure

<u>Government's Exhibit 3</u> at p. 11 of 16.

Diekman testified that nobody threatened the Defendant, or made any promises or offered any other inducements, in order to get him to waive his <u>Miranda</u> rights. However, Diekmann acknowledged that he, and the other Agents, represented to the Defendant that the intent of their investigation was to clear the Defendant of any involvement in the bank robbery. Diekmann further testified that, at no time prior to, or following, the administration of the <u>Miranda</u> warning, did any of the Agents tell the Defendant that he was free to leave, or to stop the interview at any time. According to Diekmann, the interview, at the dining room table, lasted approximately fifteen (15) to thirty (30) minutes.

Diekmann related that he and Museus then proceeded to confront the Defendant with some of the evidence that suggested he was involved in the bank robbery, and then the Defendant's demeanor changed, and he became nervous and agitated. During that questioning, Museus told the Defendant that he thought the Defendant was responsible for the bank robbery in question, and he indicated that they were going to

continue investigating the Defendant.  In particular, their exchange proceeded as follows:[3]

> CM- ok well like I said before we know we we have a lot of work to do yet um but as this continues there's things that that that happen in these deals quite often one you know people have to pay restitution back you know they have to pay for the for the money um that was taken if there's a way that ta ta kinda lessen the blow on some of that stuff you know um you know we worked real well with the county attorney here and and ah I can say for for certain that you know if this is somethin that you come up out on front and say hey I think I screwed up I made a mistake I've (inaudible)
>
> EL- no I'm not gonna say that
>
> CM- right I'm not and I'm not
>
> EL- cause I didn't do it
>
> CM- gonna ask you to say something you didn't you don't want to say but what I do wanta say is if you did screw up and you did make a mistake think about that a little bit
>
> EL- ah you know are you accusing me of this
>
> CM- um at this point yeah
>
> EL- ok
>
> CM- I am

_____

[3]In the transcript, the initials "CD" refer to Deikmann.

EL- well then I want to talk to my an attorney

CM- ok ok

EL- and I can't afford one

CM- I I understand that we're gonna do um I'm just gonna copy down some info from this ah receipt here that ah bennett ah agent bennett found we're gonna be on our way we're gonna do some more work

\*     \*     \*

CD- when was that transaction made

EL- it was made yesterday or the day before

CD- did you have a thousand bucks floatin the account

EL- no I was savin to buy new furniture from a and I you know I don't want you goin through my property any more

\*     \*     \*

CM- ok if I'm right you don' have just just think about it for a little bit if I'm right

EL- I don't have nothing to think about

CM- get on the front side of this ok

EL- I want you guys to leave

<u>Government's Exhibit 3</u>, at pp. 1-3 of 3.

Following the Defendant's invocation of his right to counsel, Diekmann acknowledged that he asked the Defendant about a financial transaction, and that the Defendant responded that he was saving money to buy new furniture, as indicated above. The Defendant proceeded to place a call to an attorney. Diekmann testified that he and Museus then left the residence in order to obtain a Search Warrant, but that the other Agents remained at the Defendant's residence in order to secure the scene. Following the execution of the Search Warrant, the Defendant was placed under arrest.

According to Deikmann, law enforcement received five (5) tips as to the suspect's identity, but they only followed up on one of the tips. During the investigation, it was reported that a man with suspicious mannerisms was seen at a branch of the First National Bank of Walker, which is located in Backus, Minnesota, earlier in the day on the date of the Akeley bank robbery. It was reported that the individual was seen hanging around suspiciously, without making any transactions. Law enforcement discovered the identity of that individual and, when witnesses were confronted with that individual's identity, they denied that he had committed the bank robbery, since he was a customer, and they were aware of who he was. In addition,

law enforcement cross referenced that customer with the list of registered Tahoe owners, and his name did not appear on that list.

## III.  Discussion

A.     The Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure.

1.     Standard of Review.     In the issuance of a Search Warrant, the Fourth Amendment dictates that an impartial, neutral, and detached Judicial Officer, will assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search, or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband.  See, Warden v. Hayden, 387 U.S. 294 (1967); United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996).  In order to find probable cause, it must be demonstrated that, in light of all the circumstances set forth in the supporting Affidavit, there is a fair probability that contraband, or evidence of a crime, will be found in a particular, designated place.  See, United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995); United States v. Tagbering, 985 F.2d 946, 949 (8th Cir. 1993).  For these purposes, probable cause is "a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal

rules." Illinois v. Gates, 462 U.S. 213, 232 (1983); see also, Ornelas v. United States, 517 U.S. 690, 695-696 (1996).

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging, hyper technical fashion.'" United States v. Ryan, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting United States v. Goodson, 165 F.3d 610, 613 (8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999). In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis. See, United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991); Technical Ordnance, Inc. v. United States, 244 F.3d 641, 649 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002).

Moreover, the reviewing Court must not engage in a de novo review but, rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant. See, United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991). This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants. See, Illinois v. Gates, supra at 236.

2.  <u>Legal Analysis</u>.  Since they involve somewhat different issues, we separately address each of the Search Warrants.

a)  <u>The First Search Warrant: The Residence</u>.  Since no challenge has been made to the execution of the first Search Warrant, we focus our attention on the "four corners" of the Warrant, so as to determine if probable cause was shown for its issuance, or if other fatal defects would justify the suppression of any evidence secured by that Warrant's execution.  Having considered all of the particulars of the first Search Warrant, and its underlying Affidavit, our review confirms the appraisal of the issuing Judicial Officer, that ample probable cause supported the issuance of the Warrant, and further, that the Warrant was not otherwise fatally defective.[4]

---

[4]The Defendant's Motion to Suppress contains the boilerplate assertion "[t]hat any consent to search given by defendant or any other person was invalid as coerced or beyond that person's apparent authority." See, <u>Docket No. 28</u>.  In his submissions, and at the Hearing, the Defendant did not discuss the validity of the Defendant's consent to search his vehicle, or his residence,  and as a consequence, we deem any argument, that may have been raised by that boilerplate language, to have been abandoned, particularly in light of our Order, which directed the Defendant to particularize the bases for any Motion to Suppress evidence.  See, <u>Docket No. 14</u> at p. 2; <u>United States v. Jones</u>, 2009 WL 4723341 at *4 (D. Minn., December 2, 2009), citing <u>United States v. Quiroz</u>, 57 F. Supp.2d 805, 822-23 (D. Minn. 1999)("In motions to suppress evidence, a moving party must * * * articulate with clarity the factual and legal basis upon which each [piece of evidence] is sought to be
(continued...)

"[P]robable cause may be established by the observations of trained law enforcement officers, or by circumstantial evidence."  United States v. Searcy, 181 F.3d 975, 981 (8th Cir. 1999)[citations omitted]; United States v. Wells, 223 F.3d 835, 839 (8th Cir. 2000)(same).  In this case, numerous pieces of information support the existence of probable cause.

First, the Affidavit disclosed that the Defendant was the registered owner of a vehicle that matched the make, color, and model, of the vehicle driven by the suspect, that the vehicle was parked outside of the Defendant's residence on the date of the Search Warrant, and that it was dirty, which was also consistent with witness descriptions.  Moreover, a consent search of that vehicle uncovered sunglasses and work gloves consistent with those worn by the suspect.  Moreover, fresh pry marks

---

[4](...continued)
suppressed."), aff'd, 213 F.3d 425 (8th Cir. 2000).

In any event, even if we were to address the issue, we find nothing in the Record to suggest that the Defendant's consent was other than voluntary, or was otherwise invalid, for many of the same reasons that we conclude, in the text of this Opinion, that the Defendant voluntarily consented to participate in his interview.  See, United States v. Pennington, 287 F.3d 739, 746 (8th Cir. 2002)("'An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search.'"), cert. denied 537 U.S. 1022 (2002), quoting United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996), cert. denied, 520 U.S. 1170 (1997), citing, in turn, Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).

suggested that the front license plate had recently been removed. The Affidavit further reported that law enforcement had observed tennis shoes in the woods which matched the description of the tennis shoes that were worn by the suspect, and that the Defendant fit the physical description of the suspect. The Affidavit also advised that the Defendant had made a recent money order transaction in the amount of $1,100.00. Given the totality of the circumstances set forth in the Affidavit, and applying a practical, common sense reading of the Search Warrant, we conclude that the Judicial Officer had a substantial basis for concluding that there was a fair probability that evidence, contraband, or the fruits of criminal activity, would be found at the Defendant's residence, in his vehicle, and on his person.[5]

In addition, we find nothing in the Record to dispute our conclusion that law enforcement established a nexus between the Defendant, and the residence and vehicle to be searched. The Affidavit disclosed that the Defendant was the registered owner

---

[5]Although we recognize that some of the statements, which were included in Museus's Affidavit, appear to be based upon the observations of other law enforcement personnel, "probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003), cert. denied, 541 U.S. 1081 (2004), quoting United States v. Horne, 4 F.3d 579, 585 (8th Cir. 1993), cert. denied, 510 U.S. 1138 (1994); see also, Doran v. Eckold, 409 F.3d 958, 965 (8th Cir. 2005), cert. denied, 546 U.S. 1032 (2005).

of the vehicle to be searched, and that vehicle was seen found earlier, on that same date, at the Defendant's residence. Most importantly, the Defendant was found at the residence, where his identity was verified, and accordingly, we find that there was a sufficient nexus between the evidence, and the places to be searched.

Lastly, while not a specific objection of the Defendant, we also find that the information contained in the Search Warrant was not impermissibly stale at the time the Search Warrant was issued. "It is axiomatic that probable cause must exist at the time of the search and not merely at some earlier time." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005), citing United States v. Formaro, 152 F.3d 768, 771 (8th Cir. 1998); see also, United States v. Ozar, 50 F.3d 1440, 1446 (8th Cir. 1995), cert. denied, 516 U.S. 871 (1995). Therefore, a lapse of time, between the observations of a witness and the issuance of a Search Warrant, like a delay in executing a Search Warrant, "may make probable cause fatally stale." United States v. Maxim, supra at 397 [quotations omitted].

"There is no bright-line test for determining when information is stale," and the passage of time, alone, is "not always the controlling factor," as other factors, such as "the nature of the criminal activity involved and the kind of property subject to the search," are also relevant to the inquiry. Id., quoting United States v. Koelling, 992

F.2d 817, 822 (8th Cir. 1993); <u>United States v. Rugh</u>, 968 F.2d 750, 754 (8th Cir. 1992); see also, <u>United States v. Kennedy</u>, supra at 1141; <u>United States v. Chrobak</u>, 289 F.3d 1043, 1046 (8th Cir. 2002).

As a result, in our analysis, we must not "simply count[] the number of days between the occurrence of the facts supplied and the issuance of the affidavit," but must consider any passage of time "in the context of a specific case and the nature of the crime under investigation." <u>United States v. Maxim</u>, supra at 397, quoting <u>United States v. Koelling</u>, supra at 822. Furthermore, "'where recent information corroborates otherwise stale information, probable cause may be found.'" <u>United States v. Ozar</u>, supra at 1446, quoting <u>United States v. Macklin</u>, 902 F.2d 1320, 1326 (8th Cir. 1990), cert. denied, 498 U.S. 1031 (1991).

Quite plainly, the information contained in the Search Warrant was not impermissibly stale, since all of the information was, at most, only a few days old. Indeed, the bank robbery occurred on February 26, 2010, and the Search Warrant was obtained on March 3, 2010. Moreover, information, that was obtained just hours before the Search Warrant issued, revealed that evidence of the bank robbery would still be found on the property, since law enforcement had observed attire, and other evidence, while at the Defendant's residence on that same date.

In sum, we find that the first Search Warrant was supported by adequate probable cause, and was not otherwise fatally defective, and we recommend that the Defendant's Motion be denied, as to the first Search Warrant.[6]

       b)    <u>The Second Search Warrant: The Cell Phone</u>.

Next, the Defendant asks that we review the second Search Warrant, which was issued on March 4, 2010, and which authorized the seizure of the Defendant's cell phone and charger, and the download of all stored data on that cell phone. As with the first Search Warrant, no challenge has been made concerning the execution of the Warrant, and accordingly, we focus our attention on the "four corners" of the Warrant, in order to ascertain whether probable cause was shown for its issuance, or if other fatal defects would justify the suppression of any evidence secured by that Warrant's execution.

As noted, the Affidavit, that was offered in support of the second Search Warrant, was executed by Museus, who attested to the fact that he had prepared a

---

[6]Even if the information in the first Search Warrant had been insufficient to establish probable cause we would be compelled, by the law of this Circuit, to find that the officers' reliance upon the first Search Warrant was reasonable, because the Warrant was not "so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." <u>United States v. McNeil</u>, 184 F.3d 770, 775 (8th Cir. 1999), citing <u>United States v. Leon</u>, 468 U.S. 897, 922-23 (1984).

Search Warrant for a search of the Defendant's residence, and that law enforcement remained on the scene for the execution of that Warrant at the time he applied for the second Search Warrant.  Museus further disclosed that, while in the Defendant's home, he observed a cell phone in the residence's kitchen, which the Defendant identified as his cell phone.

We are mindful that, in his Affidavit, Museus did not relate those facts that caused him to believe that the Defendant may have committed the bank robbery, as he had done in connection with the first Search Warrant.[7]  See, <u>United States v. Deggendorf</u>, 626 F.2d 47, 51 (8th Cir. 1980)(in order to establish probable cause to search, the affidavit must establish the probability of criminal activity, and the concealment of evidence at the place to be searched), cert. denied, 449 U.S. 986 (1980); <u>United States v. Davis</u>, 471 F.3d 938, 946 (8th Cir. 2006)("Probable cause to issue a search warrant exists when an affidavit in support of the warrant sets forth sufficient facts to establish that there is a 'fair probability that contraband or evidence

---

[7]It is not clear from the Record whether the first Search Warrant was attached to the second Search Warrant, but we note that the Warrants were signed by two (2) different Judges.  Accordingly, because nothing in the Record indicates otherwise, we will assume that the issuing Judicial Officer, for the second Search Warrant, did not have before him the first Search Warrant, and its supporting Application and Affidavit.

of' criminal activity will be found in the particular place to be searched."), quoting

<u>Illinois v. Gates</u>, supra at 238.  As a consequence, we acknowledge that the Search

Warrant was, at best, based upon a fairly slim showing of probable cause.

Nevertheless, we need not definitively decide the issue of probable cause,

because we find that, even assuming that probable cause was lacking so as to justify

the second Search Warrant, suppression would be improper under the "good faith

exception" that was articulated in <u>United States v. Leon</u>, 468 U.S. 897, 922-923

(1984).  Under <u>Leon</u>, the exclusionary rule does not apply to evidence that is

discovered through the execution of a subsequently invalidated Search Warrant, so

long as the officer's reliance on the Warrant was objectively reasonable.  <u>Id.</u> at 922.

The <u>Leon</u> Court went on to identify four situations in which an officer's reliance on

a Warrant would be unreasonable:

> (1)    the affiant included information in the affidavit that
> he "knew was false or would have known was false
> except for his reckless disregard of the truth" and
> that information misled the issuing judicial officer;
>
> (2)    the issuing judge abandoned his neutral judicial role;
>
> (3)    the warrant was based on an affidavit with so few
> indicia of probable cause that an official belief in its
> validity would be unreasonable; and

(4)     the warrant itself was so "facially deficient * * * that
        the executing officers" could not reasonably rely on
        its validity.
United States v. Simpkins, 914 F.2d 1054, 1057 (8th Cir. 1990), cert. denied, 498 U.S.
1101 (1991), citing United States v. Leon, supra at 923.

Here, there is not the slightest suggestion that there was any "reckless disregard for

the truth," or that the issuing Judicial Officer was less than neutral in issuing the

second Search Warrant.  Nor do we find any evidence that the warrant itself was so

"facially deficient" so as to preclude any objectively reasonable reliance thereon, since

it described, with particularity, the place where the specific items would be found.

Consequently, we turn to Museus's Affidavit in order to determine whether it was "so

lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable."  United States v. Leon, supra at 923[quotations omitted].

        Given the totality of the circumstances, we find that, as a matter of common

sense, it was logical, and reasonable, for law enforcement to rely on the second Search

Warrant, even though the Affidavit did not particularly describe the facts which

tended to implicate the Defendant in the bank robbery.  First, the first Search Warrant

is specifically referenced, and law enforcement were still on the scene executing the

first Search Warrant when they applied for the second Search Warrant.  Moreover,

while on the scene, the Officers saw the cell phone at the residence, and were told by

the Defendant that it was his phone.  Based upon those circumstances, it was objectively reasonable for the executing law enforcement officers to rely on the determination of the issuing Judicial Officer, that probable cause was established. See, United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007)("In assessing whether the officer relied in good faith on the validity of a warrant, we consider the totality of the circumstances, including any information known to the officer but not included in the affidavit, and we confine our inquiry 'to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing officer's] authorization.'")[citations omitted], cert. denied, --- U.S. ---, 128 S.Ct. 1704 (March 24, 2008).

Here, notwithstanding the lack of factual background in Museus's Affidavit, given that a neutral Judicial Officer had already found probable cause to search the same residence mere hours before, we find that a reasonably well-trained law enforcement officer would not have considered the search of the cell phone to be illegal.  Therefore, we find that the requested suppression of the evidence, with respect

to the second Search Warrant, would be improper under the good faith exception that was articulated in <u>Leon</u>.[8]

Consequently, we recommend that the Defendant's Motion to Suppress evidence obtained as a result of the second Search Warrant also be denied.

B.    <u>Motion to Suppress Statements, Admissions and Answers</u>.

The only statement, which is here at issue, is the statement made by the Defendant on March 3, 2010 -- the day on which law enforcement went to the Defendant's residence in order to investigate his possible involvement in the bank robbery.  First, the Defendant argues that the statements made prior to the giving of a <u>Miranda</u> warning must be suppressed because the Defendant was in custody, thereby necessitating a <u>Miranda</u> warning (the "first interview").  Second, we understand the Defendant to argue that any statements, which were made after the <u>Miranda</u> warning

_____

[8]Stated otherwise, the Judicial Officer who issued the second Search Warrant was properly apprised that law enforcement was lawfully in the Defendant's home on the basis of the first Search Warrant, and having additional averments, which revealed that the officers were investigating the Akeley bank robbery, and that the Defendant's cell phone could disclose his whereabouts during the approximate time of the bank robbery, there appears to have been a showing of probable cause -- albeit slender in its breadth -- so as to justify the issuance of the second Warrant.  Nevertheless, in the interests of caution, we predicate our denial of the Defendant's Motion to Suppress the second Warrant on the <u>Leon</u> doctrine.  See, <u>United States v. Leon</u>, 468 U.S. 897, 922-923 (1984).

was administered (the "second interview" or "post-<u>Miranda</u> statement"), must be suppressed, as an ineffective mid-interrogation <u>Miranda</u> warning, consistent with <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004). Lastly, the Defendant argues that any statements made after the Defendant's invocation of his right to counsel must be suppressed.

1. <u>Standard of Review</u>. Government agents are not required to administer <u>Miranda</u> warnings to everyone they question. See, <u>Oregon v. Mathiason</u>, 429 U.S. 492, 494-495 (1977). Rather, <u>Miranda</u> warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'" <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994), quoting <u>Miranda v. Arizona</u>, supra at 444; <u>United States v. Helmel</u>, 769 F.2d 1306, 1320 (8th Cir. 1985); <u>Berkemer v. McCarty</u>, 468 U.S. 420, 428-29 (1984). Once a suspect is in police custody and subject to interrogation, the suspect must be informed of his constitutional right to remain silent, and to be represented by legal counsel during questioning. See, <u>Miranda v. Arizona</u>, supra at 473; see also, <u>Dormire v. Wilkinson</u>, 249 F.3d 801, 804 (8th Cir. 2001), cert. denied, 534 U.S. 962 (2001).

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply

whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, supra at 322, quoting California v. Beheler, 463 U.S. 1121, 1125 (1983). As the Court in United States v. Griffin, 922 F.2d. 1343, 1347 (8th Cir. 1990) stated: "[i]f [the Defendant] believed his freedom of action had been curtailed to a 'degree associated with formal arrest,' and that belief was reasonable from an objective viewpoint, then [the Defendant] was being held in custody during the interrogation." See also, Stansbury v. California, supra at 322-323; United States v. Chamberlain, 163 F.3d 499, 502 (8th Cir. 1998).

Under the law of this Circuit, the relevant factors, which are to be considered in making a determination of custody, include an accused's freedom to leave the scene, and the purpose, place, and length, of the interrogation. See, United States v. Griffin, supra at 1348. The most comprehensive list of factors was enumerated, as follows, in United States v. Griffin, supra at 1349:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed

- 34 -

> during questioning; (5) whether the atmosphere of the
> questioning was police dominated; or, (6) whether the
> suspect was placed under arrest at the termination of the
> questioning.

See also, United States v. Ollie, 442 F.3d 1135, 1137 (8th Cir. 2006); United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005); United States v. Axsom, 289 F.3d 496, 500-501 (8th Cir. 2002).

The Court has regarded the first three (3) of the Griffin factors as mitigative in their effect upon the ultimate determination, for the presence, during the questioning, of one or more of those factors tends to weigh against a finding of custody. On the other hand, the remaining three factors have been characterized as coercive in their effect, since those factors would tend to accentuate the existence of custody. Notably, these factors "are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract." United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005), citing United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005). Instead, the Griffin factors serve as a guide in the resolution of the ultimate inquiry of "whether the defendant was restrained as though he were under formal arrest." United States v. Czichray, supra at 828.

In addition to whether or not Miranda is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence it must be

voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination.

See, <u>Dickerson v. United States</u>, 530 U.S. 428, 433-34 (2000). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." <u>Id.</u> at 434, quoting <u>Schneckloth v. Bustamonte</u>, supra at 226.

As the Supreme Court has explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)] See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961)("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant"). The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, [346 U.S. 156, 185] (1953).

<u>Id.</u> at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a <u>Miranda</u> warning has been given, see, <u>Withrow v. Williams</u>, 507 U.S. 680, 693-694 (1993); any elements of "police coercion" or overreaching, see,

Colorado v. Connelly, 479 U.S. 157, 163-164(1986); the length of the interrogation, see, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v. Denno, 347 U.S. 556, 561 (1954); the capacity of the defendant to resist pressure or exercise free will, see, United States v. Larry, 126 F.3d 1077, 1079 (8th Cir. 1997); see also, Withrow v. Williams, supra at 693-694 (listing the applicable considerations).  Lastly, the Government has the burden of proving, beyond a preponderance of the evidence, that a statement was voluntary. United States v. Wright, 706 F.2d 828, 830 (8th Cir. 1983)

2. Legal Analysis.  We address each of the three (3) arguments separately.[9]

a) The Defendant's Pre-Miranda Statement.  The Government has acknowledged that the Defendant was not advised of his Miranda rights before making his initial statement on March 3, 2010, and it is undisputed that the Defendant

---

[9]In his Memorandum submitted prior to the Hearing, the Defendant appears to argue that the statement must be suppressed as the fruit of an illegal arrest, based upon the standard set forth in Wong Sun v. United States, 371 U.S. 471 (1963).  See, Docket No. 30 at p. 2.  The Defendant did not advance this theory at the time of the Hearing, so we conclude that he has abandoned that argument.  In any event, we find no basis for such a contention, as the Defendant was quite plainly not under arrest, at the time of the statements in question.

was not under formal arrest at the time he made the statements here in question. Accordingly, the pertinent inquiry devolves to whether the Defendant's freedom of movement was restrained to a degree associated with formal arrest, so as to require a Miranda advisory and, if not, whether his statements were otherwise involuntary.

As noted, the first interview was conducted by two (2) law enforcement Agents, at the Defendant's home, with his express permission. Upon the Agents making direct contact with the Defendant, on the road outside of his property, the Defendant agreed to an interview, and escorted the Agents back to his residence, without any indication of any particular concern over their presence. Moreover, there is no suggestion, let alone any evidence, that the Defendant's freedom of movement was restrained in any way. The Defendant was not handcuffed or confined to any particular area of his property, and there is no evidence that any of the Agents physically intimidated the Defendant, or attempted to constrain him in any other way, that they refused to leave the premises at the Defendant's request, or that they refused to cease questioning him at the Defendant's request, during the course of the first interview.

We recognize that the Defendant was not advised that he was not under arrest, that he was free to terminate the interview at any time, that he was free to leave, or that he was free to ask law enforcement to leave. However, we find that,

notwithstanding the failure to inform the Defendant that his cooperation was voluntary, the totality of the circumstances establish that the Defendant was not in custody for purposes of Miranda. Compare, <u>United States v. Flores-Sandoval</u>, 474 F.3d 1142, 1147 (8th Cir. 2007)(recognizing that, while the defendant had not been informed he was free to leave, the totality of the circumstances established that his cooperation was voluntary and that he was not in custody); <u>United States v. Mottl</u>, 946 F.2d 1366, 1370 (8th Cir. 1991)(noting that law enforcement did not tell the defendant that he free to leave, or that he was not under arrest, but concluding that the defendant was not in custody, where his freedom of movement was not restrained, he voluntarily agreed to participate, and no deceptive stratagems were employed); <u>United States v. Axsom</u>, 289 F.3d 496, 501 (8th Cir. 2002)(finding that the defendant was not in custody for <u>Miranda</u> purposes, even though the FBI agents did not inform the defendant that he was not under arrest, that the questioning was voluntary, that he could refuse the interview request, or that he was free to leave, where the totality of the circumstances indicated that the defendant was not in custody). Although it would have been better had the Agents informed the Defendant of the voluntariness of his cooperation, our conclusions must be based upon the totality of the circumstances rather than any single factor.

Turning next to the fourth <u>Griffin</u> factor, we find no evidence that law enforcement employed strong arm tactics or deceptive stratagems. There is no evidence that law enforcement officers threatened or intimidated the Defendant, or that they made any promises, in order to obtain his cooperation. It is likely that all of the Agents were armed, but there is no suggestion that any weapons were drawn or brandished at any point, or that the weapons were used to threaten or intimidate the Defendant. See, <u>United States v. Galceran</u>, 301 F.3d 927, 930 (8th Cir. 2002) ("[A]lthough the officers had weapons, they 'did not adopt a threatening posture toward [the defendant], display their weapons, or make a physical show of force during the questioning.'")[citation omitted]; compare, <u>United States v. Czichray</u>, supra at 833 (finding that, where agents threatened "to interfere with [the defendant's] legitimate business and to 'light up his life,' insinuating that they would begin investigating his elderly father," the facts supported an inference of custody).

We are mindful that law enforcement represented to the Defendant that they were investigating him in order to "clear" him, notwithstanding the fact that the Defendant was the primary suspect at the time of the interview. While the Agents were not entirely forthright, in this respect, they did not misrepresent the fact that they were investigating a bank robbery, and that they were there to question the Defendant

in connection with that investigation, given that his vehicle and physical description matched that of the suspect. Accordingly, we find no basis for concluding that the agents employed deceptive stratagems.

Lastly, while we recognize that there were five (5) law enforcement Agents present, on or near the Defendant's property, during the initial interview, only two (2) Agents participated in the interview of the Defendant. Moreover, our Court of Appeals has advised that, where the questioning of a defendant is conducted "in the comfort and familiarity of his home," it is less likely that a defendant will be deemed to have been in custody, notwithstanding the presence of several law enforcement agents. See, United States v. Axsom, supra at 502 (interview was not custodial despite the presence of nine (9) agents, where only two Agents participated in the interview, the evidence reflected a "more casual scene," and the interview was conducted in the defendant's home); see also, United States v. Rorex, 737 F.2d 753, 756-757 (8th Cir. 1984)(finding that questioning of the defendant on "his own turf," -- that is, his office at his place of business -- was not custodial, even though the search of the defendant's store "added some coercive aspects."); compare, United States v. Czichray, supra at 832-833 (finding that the defendant was in custody, even though he was in his own home, where Agents directed the defendant not to communicate

with others, limited his access to the telephone, and restricted his movement about his

own home).

As our Court of Appeals has advised,

> [Oregon v. Mathiason, 429 U.S. 492 (1977)] and
> [California v. Beheler, 463 U.S. 1121(1983)] teach us that
> some degree of coercion is part and parcel of the
> interrogation process and that the coercive aspects of a
> police interview are largely irrelevant to the custody
> determination except where a reasonable person would
> perceive the coercion as restricting his or her freedom to
> depart.

United States v. LeBrun, 363 F.3d 715, 721 (8th Cir. 2004), cert. denied, 543 U.S.
1145 (2005).

Accordingly, given the absence of the usual attributes of custody, we find that the

relative proximity of five (5) armed law enforcement officers, during the course of an

interview, did not serve to convert the interview into a custodial interrogation, since

no reasonable person could have believed that his freedom to depart was restrained,

given the totality of the circumstances, as we have detailed.   See, United States v.

Black Bear, 422 F.3d 658, 663 (8th Cir. 2005)(defendant not in custody where police-

domination did not result in the kind of restraint on movement associated with formal

arrest).

We further recognize that the Defendant was placed under arrest following the execution of the Search Warrant that was obtained shortly after that interview. However, we note that the arrest did not occur at the conclusion of the first, or even the second interview, and clearly a considerable amount of time passed between the first interview and that arrest. Moreover, the Defendant was given a Miranda warning during the intervening period, and interviewed a second time. As such, we find little connection between his later arrest, and the custodial nature of his first interview.

Lastly, based mainly upon those same factors, we also find that the Defendant's statement was voluntary, since we find no evidence that police coercion, or the length, location, or nature of the questioning, overwhelmed the Defendant's will or self-determination, so as to elicit his statements against his will. Indeed, there is nothing to suggest that his statement to law enforcement was anything but the product of his own choice to cooperate.

As noted, the Record reflects that the Defendant was not handcuffed or otherwise physically restrained. Furthermore, the evidence supports that the Defendant was not denied any normal accommodations of daily living. Most importantly, as we have already detailed, there is also no evidence that the Agents engaged in coercive conduct during the course of the interview, since there is no

evidence that any of the Agents made any promises to the Defendant, that they threatened him in any way, or that the Agents somehow duped the Defendant into answering their questions. To be sure, the Agents were not forthright regarding the level of their interest in the Defendant, at least initially. As we already stated, however, the Defendant was not misled as to the fact that he was under investigation for the robbery, and as such, we cannot see how this would somehow make his statement involuntary, or the subject of police coercion.

Moreover, by all appearances, the Defendant understood what was happening, and what the Agents were asking him, and there is no evidence to suggest the existence of any physical, or mental impairments, that would impact upon the voluntariness question. Quite notably, the Defendant fails to support his assertion, that his statement was involuntary, with any specific, and evidence-based, demonstration of coercion, and our review of the Record has found none. Accordingly, we find that the interviewing Agents did not engage in coercive conduct, much less conduct sufficient to have overborne the Defendant's will.

In sum, we find that the Defendant's first statement was non-custodial, and was not taken in violation of <u>Miranda</u>, nor was it otherwise involuntary, and as a

consequence, we recommend that the Defendant's Motion to Suppress Statements, as to the first interview, be denied.

b) <u>The Defendant's Post-Miranda Statement</u>. The Defendant also argues that his post-Miranda statement should be suppressed as an unlawful mid-interrogation <u>Miranda</u> warning. In particular, he argues that such a strategy is analogous to that found impermissible in <u>Missouri v. Seibert</u>, supra, and requires the suppression of the post-<u>Miranda</u> statement.

In <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), the Supreme Court first considered the mid-interrogation <u>Miranda</u> situation. There, the police arrived at the defendant's home in order to arrest him on burglary charges, at which time, the defendant incriminated himself in response to police questioning, and prior to being advised of his rights. Approximately one (1) hour later, at the police station, the arresting officer provided the defendant with a <u>Miranda</u> warning, the defendant waived his rights, and the defendant once again confessed. The defendant argued that the police station confession should have been suppressed.

In <u>Elstad</u>, the Supreme Court held that, "[t]he later statement was admissible so long as it was made voluntarily, and its voluntariness was not undercut by the suspect's ignorance that his initial statement could not be used against him." <u>United</u>

States v. Ollie, 442 F.3d 1135, 1141 (8th Cir. 2006), citing Oregon v. Elstad, supra at

316-317.  The Supreme Court explained its reasoning, as follows:

> Far from establishing a rigid rule, we direct courts to avoid
> one; there is no warrant for presuming coercive effect
> where the suspect's initial inculpatory statement, though
> technically in violation of Miranda, was voluntary.  The
> relevant inquiry is whether, in fact, the second statement
> was also voluntarily made. * * * We find that the dictates
> of Miranda and the goals of the Fifth Amendment
> proscription against use of compelled testimony are
> satisfied in the circumstances of this case by barring use of
> the unwarned statement in the case in chief * * * [and] [w]e
> hold * * * that a suspect who has once responded to
> unwarned yet uncoercive questioning is not thereby
> disabled from waiving his rights and confessing after he has
> been given the requisite Miranda warnings.

Oregon v. Elstad, supra at 318.

As our Court of Appeals has advised, "[i]n response to Elstad, some police officers

began to conduct "question-first" interrogations, where officers would intentionally

refrain from giving the Miranda warnings to suspects in custody * * * [and] [o]nce the

police elicited a confession (which they knew to be inadmissible), they would then

give the warnings."  United States. v. Ollie, supra at 1141.  The suspect would often

confess again, and, when the admissibility of the second statement was challenged, the

Courts would rely on Elstad to uphold the admissibility of those statements.  Id.

Accordingly, in Missouri v. Seibert, supra, the Supreme Court revisited the legality of mid-interrogation Miranda warnings. There, prior to administering a Miranda warning, the officer questioned the defendant for thirty (30) to forty (40) minutes, during which the officer used coercive tactics, and the defendant confessed. After a twenty (20) minute break, the officer gave the defendant a Miranda warning, obtained a signed waiver of rights, and the defendant again confessed.

In considering such tactics, the Court, in a plurality opinion, set forth a multi-factor test, which requires a consideration of several factors, including the following: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Missouri v. Seibert, supra at 615; see also, United States v. Briones, 390 F.3d 610, 613 (8th Cir. 2004), 545 U.S. 1122 (2005). Justice Kennedy, who provided the necessary fifth vote, decided the case on narrower grounds than the majority, and therefore, "his opinion is of special significance." United States v. Briones, supra at 613, citing Romano v. Oklahoma, 512 U.S. 1, 9 (1994), and Marks v. United States, 430 U.S. 188, 193 (1977).

In the view of Justice Kennedy, "the key question is whether the police conduct was deliberately devised to obtain incriminating statements by circumventing Miranda." Id., citing Missouri v. Seibert, supra at 622. "[T]he principles of Oregon v. Elstad * * * control when the police have not deliberately used separate interrogations to elicit incriminating statements through belated Miranda warnings." Id. at 613. Otherwise, "postwarning statements related to the substance of what was said earlier are inadmissible in the absence of curative measures." Id. at 614.

Here, since we have already determined that the Defendant's pre-Miranda statement was not taken in violation of Miranda, we find that Missouri v. Seibert is inapplicable to the facts of this case. As we have detailed, the Agents were not obligated to provide a Miranda warning during their first interview of the Defendant, because he was not in custody, and the fact that the Agents later advised the Defendant of his rights does not invalidate that conclusion.

In any event, even if we assumed that the statement given by the Defendant, in connection with the first interview, was taken in violation of Miranda, we would still find that Seibert does not compel a suppression of the post-Miranda statement. In Seibert, "[t]he first step in Justice Kennedy's analysis is to determine whether a staged interrogation process was used as a deliberate strategy." Id. Here, there is no

evidence that any such deliberate strategy was used in conducting the pre-<u>Miranda</u> interview of the Defendant. Notably, the initial questioning related to general questions as to the Defendant's whereabouts on the day of the bank robbery, and other basic questioning, and small talk. During those initial comments, law enforcement did not press the Defendant regarding any evidence, or inconsistencies, that suggested the contrary, but, in the post-<u>Miranda</u> interview, law enforcement confronted the Defendant with evidence that suggested that he was lying about his involvement in the bank robbery. Nor is there any evidence that law enforcement were merely going over the statements that the Defendant had already made, or that the Agents employed staged interrogations so as to evade the requirements of <u>Miranda</u>.

Accordingly, because there is no evidence that law enforcement used a deliberate strategy to circumvent the requirements of <u>Miranda</u>, the question then becomes whether the second statement is admissible under the principles enunciated in <u>Oregon v. Elstad</u>. <u>Id.</u> at 614; <u>United States v. Hernandez-Hernandez</u>, 384 F.3d 562, 566 (8th Cir. 2004), citing <u>Reinert v. Larkins</u>, 379 F.3d 76, 91 (3rd Cir. 2004); <u>United States v. Aguilar</u>, 384 F.3d 520, 525 (8th Cir. 2004).

The Court has explained those principles as follows:

> It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

United States v. Villalba-Alvarado, 345 F.3d 1007, 1010 (8th Cir. 2003), quoting Oregon v. Elstad, supra at 309.

Here, we find no responsible dispute as to whether the Defendant knowingly and voluntarily waived his Miranda rights. The transcript of the interview reflects that law enforcement fully apprised the Defendant of each of his rights under Miranda v. Arizona, supra, and the Defendant agreed to proceed by answering law enforcement's questions. Accordingly, since there is nothing in the Record to suggest that law enforcement employed coercive tactics in procuring those waivers, we find that the Defendant knowingly, intelligently, and voluntarily, waived his Miranda rights.

Further, as we have already detailed, the Defendant's "earlier unwarned statements did not result from coercion or a calculated effort to undermine his will." United States v. Briones, supra at 614. Consequently, we find that the Defendant's post-Miranda statement is admissible. See, United States v. Rodriguez-Hernandez,

353 F.3d 632, 635 (8th Cir. 2003)("[A] post-<u>Miranda</u> warning statement to the INS agent need only be suppressed if it was involuntary."), citing <u>Oregon v. Elstad</u>, supra at 309; <u>United States v. Villalba-Alvarado</u>, supra at 1013.

On a final note, we further conclude that there is no evidence that the Defendant's second interview was involuntary, since we do not find the second interview to be qualitatively different from the first, with respect to the voluntariness question. As we found with respect to the first interview, there is no evidence in the Record that police coercion, or the length, location, or nature of the questioning, overwhelmed the Defendant's will or self-determination so as to elicit his statements against his will. While we are mindful that law enforcement told the Defendant that it was in his interest to cooperate, so as to "get in front of this thing," the Record reflects that no promises, as to leniency, were made. Agents were merely advising the Defendant that it may be to his benefit to cooperate with law enforcement. Notably, upon being confronted with the evidence against him, the Defendant requested an attorney, ceased the interview, and asked law enforcement to leave. Accordingly, we find that the interviewing Agents did not engage in coercive conduct, much less conduct sufficient to have overborne the Defendant's will. As we have detailed, the

Defendant's second interview was plainly the product of his consent to cooperate with law enforcement -- consent that he eventually withdrew of his own free will.

Accordingly, we recommend that the Defendant's Motion to Suppress Statements, Admissions, and Answers, be denied, with respect to the Defendant's second interview, because we find no competent basis for concluding that the taking of that statement violated <u>Miranda</u>, or was otherwise involuntary.

  c) <u>Statements After Invocation of Right to Counsel</u>.

As noted, at the end of the second interview, the Defendant invoked his right to counsel and, following that invocation, Diekmann asked the Defendant another question.

It is well-established that once a suspect unequivocally invokes his right to counsel, law enforcement must cease all interrogation until counsel has been made available to him, or the suspect initiates further communication of his or her own accord.  See, <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981); <u>Dormire v. Wilkinson</u>, supra at 804; <u>United States v. Hull</u>, 419 F.3d 762, 767 (8th Cir. 2005), cert. denied, 547 U.S. 1140 (2006).  At the time of the Hearing, the Government indicated that it does not dispute that the Defendant invoked his right to counsel, and it does not object to the suppression of post-invocation portion of the Defendant's statement.  As

a consequence, to that extent, we grant the Defendant's Motion to Suppress Statements, Admissions, and Answers.[10]

C.   The Eyewitness Identification.

At the time of the Hearing, the Defendant advised that its Motion to Suppress Eyewitness Identifications was directed at the suppression of a witness identification of a firearm.  The Defendant contends that the presentation of the gun to the witness, who was a teller at the Bank on the day of the bank robbery, was unnecessarily suggestive, and asks that the evidence of that identification be suppressed.  For its part, the Government contends that the presentation of the firearm

---

[10]As noted, at the time of the Hearing, the Government advised that it did not object to the suppression of the post-invocation portion of the Defendant's statement, except to the extent that, in its view, the admission of that statement would be harmless, since the Defendant made similar statements prior to the invocation of his right to counsel.  Whether the admission of the statement would be harmless or not, we cannot say.  Of course, "[t]he admission of statements obtained in violation of Miranda may constitute harmless error where there remains overwhelming independent evidence as to the defendant's guilt."  United States v. Packer, 730 F.2d 1151, 1157 (8th Cir. 1984)[citing cases]; United States v. Santos, 235 F.3d 1105, 1108 (8th Cir. 2000).  As the case law makes clear, however, such a conclusion presupposes an evaluation of the other evidence that was admitted.  Such an evaluation is impossible at the pretrial stage, and furthermore, the Government has provided no support for its argument that we may deny a Motion to Suppress, prior to the Trial, based upon the contention that the statement is somehow harmless.  Accordingly, notwithstanding that the admission of the statement may arguably be harmless, we decline to make such a determination at this juncture.

does not constitute a positive identification, because the witness was merely asked whether the weapon appeared to be similar to the firearm used by the suspect.

We find no authority, nor has the Defendant cited any, for the proposition that the identification of evidence by a witness may be suppressed as unnecessarily suggestive. While a Jury, as the fact finder, might well come to that conclusion, we know of no instance in which, on a pretrial basis, such identification evidence is subject to suppression, and the Defendant draws none to our attention. As we find the Defendant's argument to be wholly without merit, we recommend that the Defendant's Motion to Suppress Eyewitness Identification be denied, regardless of the issue of whether the presentation of the weapon may have been unnecessarily suggestive.

NOW, THEREFORE, it is --

RECOMMENDED:

1.      That the Defendant's Motions to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 28] be denied.

2.      That the Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 29] be denied in part, and granted in part, as more fully detailed in the text of this Report.

3.   That the Defendant's Motion to Suppress Eyewitness Identification [Docket No. 31] be denied.


Dated: June 1, 2010                        s/Raymond L. Erickson
                                           Raymond L. Erickson
                                           CHIEF U.S.  MAGISTRATE JUDGE


## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than June 15, 2010**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than June 15, 2010,** unless all interested parties

stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.